## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| EVERGREEN ENERGY, INC., *et al.*,[1] | ) | Case No. 12-10289 (KJC) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| CHARLES A. STANZIALE, JR., in his capacity | ) | |
| as Trustee of Evergreen Energy, Inc. and other | ) | |
| jointly administered debtors, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 12-50740 (KJC) |
| | ) | |
| ILYAS TARIQ KHAN, STANHILL SPECIAL | ) | (Re: D.I. 16) |
| SITUATIONS FUND, STANHILL CAPITAL | ) | |
| PARTNERS, LTD., and CROSBY (HONG | ) | |
| KONG), LTD. | ) | |
| Defendants | ) | |

## MEMORANDUM[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On January 23, 2012, Evergreen Energy, Inc. ("Evergreen") and related entities filed

chapter 7 bankruptcy petitions in this Court. The chapter 7 trustee, Charles A. Stanziale, Jr., (the

"Trustee") filed a 15 count adversary complaint against former director Ilyas Tariq Khan

("Khan") and entities that he owned or controlled (the "Defendants"), alleging claims based on

fraud, negligent misrepresentation, breach of fiduciary duty, tortious interference with

---

[1]By order dated February 17, 2012, this Court authorized joint administration of the following debtors: Evergreen Energy, Inc.; Evergreen Energy International, LLC; Evergreen Operations, LLC; KFx Operations, LLC; Evergreen Energy Asia Pacific Corp.; KFx Technology, LLC; Blimco, Inc.; KFx Plant, LLC; C-Lock Technology, Inc.; and Landrica Development Company (collectively, the "Debtors").

[2] This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. This matter includes core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F), (H) and (O). The parties have consented to entry of a final order on all claims by this Court. (*See* D.I. 32.)

prospective business relations, avoidance of fraudulent transfers and preferential transfers, and violation of 15 U.S.C. § 78o(a)(1).  The claims arise out of an unconsummated sale of Evergreen's subsidiaries, as well as a series of payments made by Evergreen to certain Defendants under professional service agreements. Before me is the Defendants' motion to dismiss the First Amended Adversary Complaint (D.I. 13) (the "Complaint") pursuant to Fed.R.Civ.P 12(b)(6), made applicable hereto by Fed.R.Bankr.P. 7012(b), for failure to state claims upon which relief may be granted.  For the reasons set forth herein, the Defendants' motion to dismiss the Complaint will be granted, in part, and denied, in part.

FACTUAL ALLEGATIONS

Evergreen is a Delaware corporation with a place of business in Denver, Colorado. (Compl. ¶9.) Evergreen's primary business was the development of K-Fuel, a patented process intended to improve the performance of low grade sub bituminous and brown coal and lignite to allow coal burning boilers and power plants to improve performance and reduce emissions. (Compl. ¶14.) There are competing processes for upgrading coal that have been developed by competitors, including a competing process owned and controlled by White Energy Company, Ltd. ("White Energy"). (Compl. ¶16.)

In the years leading up to 2010, Evergreen incurred significant capital costs in connection with the development of K-Fuel and experienced negative cash flow. (Compl. ¶32).  The balance sheet contained in Evergreen's 2010 10-K indicated assets of $29,558,000 and liabilities of $43,050,000.  (Compl. ¶37).  The notes to the financial statements in Evergreen's 2010 10-K also indicated a need for additional capital, a history of losses, and a substantial doubt as to the ability of Evergreen to continue as a going concern.  (Compl. ¶36.)

On December 8, 2010, Evergreen's board approved a resolution inviting Khan to become a member of the board and Executive Chairman of Evergreen. (Compl. ¶24). Khan was a founding director and served on the board of competitor White Energy from its inception until 2010.[3] (Compl. ¶20.) Khan and entities he owns or controls continued to hold shares or share rights in White Energy after Khan left White Energy's board and during the time Khan was a member of Evergreen's board. (Compl. ¶21.)

In the December 8, 2010 resolution, the Evergreen board also approved a Professional Services Agreement ("PSA") with Crosby Special Situations Fund, which later became known as the Stanhill Special Situations Fund ("SSSF"). (Compl. ¶23, ¶27). Khan was a principal of SSSF. (Compl. ¶23.) The PSA provided that SSSF would support the business development and financing of Evergreen in return for £ 250,000 per annum plus reimbursement of expenses of up to £ 150,000 per annum and 1,238,150 warrants with a term of five years. (Compl. ¶25.) The PSA was amended on July 1, 2011 to increase cash compensation to £ 300,000 per annum. (Compl. ¶26.)

Evergreen entered into another Professional Services Agreement ("PSA2") for financial advisory services with Crosby (Hong Kong), Ltd., a merchant banking entity of which Khan was a principal. (Compl. ¶28.) The compensation to Crosby (Hong Kong), Ltd. stated in PSA2 was $663,750 and 238,654 three year warrants. (Compl. ¶29.)

In January 2011, Khan described the financial condition of Evergreen as "perilous." (Compl. ¶41.) On February 1, 2011, Evergreen completed the contemplated financing referred to in the PSA which consisted of private placement of 6,150,003 shares of common stock and 12,000,003 warrants, yielding gross proceeds of $15.99 million. (Compl. ¶46.) Khan resisted a

---

[3] The Complaint does not provide a specific date.

larger offering, although others in Evergreen's management believed the company could have

succeeded in a larger offering and needed more capital than that raised in the February 1

transaction. (Compl. ¶46.)  Evergreen paid Lazard Capital Markets $650,000 to conduct the

placement, which included identifying and contacting prospective purchasers. (Compl. ¶47).

Evergreen also paid Crosby (Hong Kong), Ltd. over $731,000 in connection with the financing,

although Crosby (Hong Kong) Ltd. sold less than half the securities and did not provide the

placement services that were provided by Lazard.  (Compl. ¶47.)

The unaudited financial statement in the Evergreen 10-Q for the period ending March 31,

2011 indicated a continued excess of liabilities over assets.  (Compl. ¶38.)  The notes to that

10- Q indicated a substantial doubt as to the ability of Evergreen to continue as a going concern,

as well as the need to acquire additional capital to continue development of the K-Fuel process.

(Comp. ¶38.)  As early as spring 2011, Khan informally advised members of Evergreen's

management that if the share price did not reach $5.00, Evergreen should not remain public, and

Kahn stated that he would purchase Evergreen.  (Compl. ¶50.)

On or before September 26, 2011, Khan advised Evergreen that he was assembling a

group to consider acquiring Evergreen's K-Fuel business.  (Compl. ¶50.)  On September 26,

2011, the Evergreen board established a Special Committee consisting of directors (not including

Khan) to negotiate a transaction and solicit alternative transactions, if the Special Committee

deemed it appropriate.  (Compl. ¶51.)  On September 28, 2011, Stanhill Capital Partners, Ltd.

("Stanhill"), of which Khan is a principal, delivered a written offer to purchase the shares of

certain Evergreen subsidiaries (described as the "Sale Companies") that held the rights to the K-

Fuel process and technology for $30 million, subject to contingencies including due diligence,

regulatory and party approval, and other matters (the "Stanhill Offer"). (Compl. ¶52.) The

Stanhill Offer provided that:

> This letter constitutes a formal offer, and we anticipate that a sale and purchase agreement will need to be finalized. We can confirm that Stanhill Capital's offer is therefore deemed to be a formal proposal. We can also confirm that our due diligence approach will be confirmatory in nature [and] is not expected to take more than 10 days.

(Compl. ¶53.) One of the contingencies of the Stanhill Offer was that no shares or options in the

Sale Companies would be granted to third parties. (Compl. ¶55.) Previously, in August of 2011,

Evergreen had implemented a stock sale program called At the Market ("ATM") which

permitted Evergreen to sell shares in stock exchange transactions. (Compl. ¶56.) ATM

promised to be a valuable source of needed capital for Evergreen; however, the Stanhill Offer

affected trading in Evergreen's shares and reduced ATM's potential. (Compl. ¶56.) Khan was

aware of the effect of the Stanhill Offer on Evergreen's ability to seek alternative transactions or

financing, and on Evergreen's ability to raise capital through ATM. (Compl. ¶55, ¶56.)

In an email dated September 29, 2011, (as well as other instances) Khan represented to

Evergreen and members of the Special Committee that Stanhill had obtained financing to fund

the Stanhill Offer. (Compl. ¶ 72.)

On October 4, 2011, Evergreen filed an 8-K with the SEC describing the Stanhill Offer

and Khan's existing role and position at Evergreen. (Compl. ¶ 54.) On October 12, 2011, the

Special Committee selected Cooley, LLP to act as their counsel in connection with the Stanhill

Offer (Compl. ¶57.) On October 19, 2011, the Special Committee entered into an agreement to

retain Dahlman Rose & Co. (the "Committee's Financial Advisor") to serve as lead financial

advisor in connection with the Stanhill Offer and potential alternative transactions. (Compl. ¶62.)

On November 1, 2011, the Special Committee reported to the Evergreen board that its Financial Advisor would undertake a market test of K-Fuel so that the Special Committee would be well-informed in responding to the Stanhill Offer. (Compl. ¶66.)  The market test was intended to assist the Special Committee in evaluating the fairness of the Stanhill Offer, rather than to develop alternatives.  (Compl. ¶63.)  The timing of the market test relative to acceptance of the Stanhill Offer resulted from Khan's refusal to agree to a "Fiduciary Out" clause or break-up fee in any agreement, which negatively affected Evergreen's ability to seek other transactions. (Compl.¶67.)

At the November 1, 2011 meeting, Khan advised Evergreen's board that Stanhill intended to assume responsibility of the Bechtel Agreement and the Koppelman litigation. (Compl. ¶68.) Evergreen and Bechtel Power Corporation entered into an agreement which included certain milestones for Evergreen to meet in connection with the K-Fuel process, and provided that Bechtel could assert a claim for liquidated damages of not less than $10 million if Evergreen failed to achieve those milestones. (Compl. ¶68, ¶69.)  The Koppelman litigation involved a lawsuit filed in June 2011 by the Koppleman Trust against Evergreen and its directors arising from a royalty agreement for intellectual property developed by Edward Koppelman related to K-Fuel.  (Comp. ¶70.)

On November 3, 2011, the Committee's Financial Advisor provided Stanhill's representatives with access to a data room containing corporate records of Evergreen and technical information regarding K-Fuel.  (Compl. ¶73.)

At a meeting on November 4, 2011, the Evergreen board discussed communications about the potential de-listing of Evergreen with the NYSE Arca due to Evergreen's financial

condition, share price and other circumstances.[4]  (Compl. ¶74.)  Khan indicated he would contact

NYSE Arca to tell them about the Stanhill Offer and would reach out to WPG Resources (a joint

venture partner with Evergreen) to discuss potential financing assistance. (Compl. ¶75.)  The

board also discussed contacting Stanhill to determine if the terms of the Stanhill Offer remained

outstanding or had been revised. (Compl. ¶77.)

During the period when the Stanhill Offer was being evaluated and considered,

Evergreen provided Stanhill with one or more counterproposals to the Stanhill Offer, which

Stanhill agreed to consider.  One such offer, made in early November 2011, involved the

purchase of all of Evergreen's shares. (Compl. 79.)

On November 12, 2011, Australian.com reported an adverse development for White

Energy involving a facility in Indonesia that White Energy had constructed at the cost of

$100 million (Australian Dollars). (Compl. ¶80.)  White Energy expected to purchase coal for

the project at a price below the export price, but the seller announced it would charge White

Energy the full export price weeks before the facility was expected to become operational,

jeopardizing the project and negatively affecting White Energy's share price.  (*Id.*)

On November 13, 2011, Khan advised Evergreen that he, and one of his appointees, were

resigning from the Evergreen board, effective immediately. (Compl. ¶81.)

---

[4] "NYSE Arca, Inc. an electronic stock market, enables the customers to trade equity securities and options products listed in the stock exchange markets in the United States. It engages in trading exchange-traded funds and exchange-listed securities." *Diversified Financial Services: Company Overview of NYSE Arca, Inc.*, Bloomberg Bus., http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=7960146 (last visited Feb. 11, 2016).  "As of 2009, The NYSE Arca is the world's second largest electronic communication network (ECN) in terms of shares traded. It accounts for roughly 10% of NYSE-listed securities traded and 20% of Nasdaq-listed securities traded." *NYSE Arca*, Investopedia, http://www.investopedia.com/terms/n/nyse-arca.asp (last visited Feb. 11, 2016).

On November 14, 2011, the Committee's Financial Advisor reported Khan's new demand that the Bechtel agreement be terminated before the Standhill Offer could proceed. (Compl. ¶82.) As a result, the board concluded that the Stanhill Offer was now uncertain. (Compl. ¶83.)

On November 19, 2011, the Committee's Financial Advisor reported several important developments to the Evergreen board about the effect of the Stanhill negotiations on Evergreen's ability to market the K-Fuel business to other potential bidders. (Compl. ¶84.) The Committee's Financial Advisor had contacted 60 potential acquirers of K-Fuel, and all, but one, either did not respond or declined to participate. (Compl. ¶85.) Those potential acquirers who declined to participate indicated that Stanhill's knowledge about Evergreen's technology made them reluctant to bid. (Compl. ¶86.)

On November 22, 2011, Stanhill notified the Committee's Financial Advisor that it was withdrawing its offer to acquire the K-Fuels assets. (Compl. ¶89.) On the same day, the board held a meeting and discussed the fact that the pending Stanhill Offer had impeded Evergreen's ability to obtain financing from other sources and left Evergreen in a precarious position. (Compl. ¶90.) Evergreen sought another sale transaction or alternative source of funding. (Compl. ¶91.) Evergreen took drastic actions to reduce costs. (Compl. ¶92.) Evergreen's efforts were not successful and on or about January 17, 2012, Evergreen's board determined that Evergreen and its affiliates would file chapter 7 petitions. (Compl. ¶93.)

STANDARD

Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the

merits of the case."[5] When reviewing a motion to dismiss, the court will construe the complaint "in the light most favorable to the plaintiff." [6]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[7] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."[8]

The Court of Appeals for the Third Circuit has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." [9]

---

[5] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).

[6] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)).

[7] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

[8] *Twombly*, 550 U.S. at 555 (citations omitted).

[9] *Burtch*, 662 F.3d at 221 (citations omitted).

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied on in the complaint."[10] The movant carries the burden of demonstrating that dismissal is appropriate.[11]

DISCUSSION

1.    Fraud and Negligent Misrepresentation

The Trustee asserts claims of fraud and negligent misrepresentation alleging that Khan, Stanhill and SSSF made representations to Evergreen and others, knowing that the representations were untrue, to induce Evergreen to pursue the Standhill Offer rather than seek alternative sale transactions or sources of financing.  (Compl. ¶97, ¶98.)  The alleged misrepresentations include the Stanhill Offer and statements that (i) Stanhill would assume the Bechtel and Koppelman liabilities, (ii) Stanhill could provide interim financing to Evergreen while the sale was pending, and (iii) Stanhill had financing in place for closing.  The Defendants argue the allegations in the Amended Complaint fail to support and, in fact, contradict these claims.

To establish a claim of fraud under Colorado law,[12] a plaintiff must allege that:

(i) the defendant made a false representation of a material fact; (ii) that the party making the representation knew it was false, (iii) that the party to whom the representation was made did not know of the falsity; (iv) that the representation was made with the intent that it be acted upon; and (v) that the representation resulted in damages.[13]

---

[10] *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[11] *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d at 408.

[12] Both sides agree that Colorado law applies to the negligent misrepresentation and fraud claims.

[13] *Brody v. Bock*, 897 P.2d 769, 775-76 (Colo. 1995) citing *Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo. 1987).

"[A] claim of fraud may be premised upon one party's 'promise concerning a future act . . .

coupled with a present intention not to fulfill the promise[.]'"[14]    The gist of the fraud action is

that the plaintiff changed position in justifiable reliance on the defendant's knowing false

statement.[15]

> To establish a negligent misrepresentation claim, a plaintiff must allege that:
>
> (1) someone in the course of his or her business, profession or employment;
> (2) makes a misrepresentation of a material fact, without reasonable care; (3) for
> the guidance of others in their business transactions; (4) with knowledge that his or
> her representations will be relied upon by the injured party; and (5) the injured party
> justifiably relied on the misrepresentation to his or her detriment.[16]

The Defendants argue that an important requirement for both claims is justifiable reliance

on the alleged misrepresentations.  The Defendants further claim that the Complaint's allegations

contradict any inference that Evergreen justifiably relied on those statements because the alleged

facts show that (i) the Stanhill was offer was conditional; (ii) Evergreen established the Special

Committee and hired professionals to perform a market test and solicit alternative transactions;

and (iii) Evergreen made counteroffers to Stanhill.

The Trustee argues that determining whether Evergreen justifiably relied on the

misrepresentations is an issue of fact that is not appropriate for consideration in a motion to

---

[14] *Id.*at 776.

[15] *Id.*  To establish fraud, a plaintiff must prove (i) a defendant fraudulently misrepresented a material fact,
(ii) the plaintiff relied on the misrepresentation, (iii) the plaintiff had the right to rely on, or was justified
in relying on, the misrepresentation, and (iv) the reliance resulted in damages.  *M.D.C./Wood, Inc. v.
Mortimer,* 866 P.2d 1380, 1382 (Colo. 1994).

[16] *Denver Health and Hospital Auth. v. Beverage Distrib. Co., LLC,* 843 F.Supp.2d 1171, 1178 (D. Colo.
2012).

dismiss.[17] The Defendants argue in response that the factual allegations in the Complaint, which are assumed true for purposes of deciding the motion, contradict assertions of justifiable reliance. "[T]he court will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself." [18]

The Stanhill Offer, as written, was conditional, stating that it was a "formal proposal" and anticipating that a "sales and purchase agreement will need to be finalized." (Compl. ¶53.) Generally, it is not reasonable to alter one's behavior in reliance of a conditional offer.[19] The Trustee argues, however, that he is not seeking to *enforce* the offer, but is seeking damages based on Evergreen's reliance on the false offer and, therefore, the conditional nature of the offer does not prevent his claims.[20] The Trustee also alleges that Evergreen's reliance was reasonable

---

[17] *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.,* 892 P.2d 230, 239 (Colo. 1995) (deciding that material issues of fact precluded summary judgment on reliance issue). *See also Maloul v. Berkowitz,* No. 07-Civ-8525, 2008 WL 2876532, *2 (S.D.N.Y. Jul. 23, 2008) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

[18] Wright & Miller, 5B *Fed.Prac.& Proc.* §1357 n. 31 (3d ed.); *See also Williams v. Rickard,* No. CIV 09-00535, 2010 WL 2640102, at *3 (D. Haw. June 30, 2010) ("[T]he court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint.")

[19] *Glass v. Kemper Corp.,* 133 F.3d 999, 1004 (7th Cir. 1998) (deciding that an employee could not reasonably rely on an offer that was "implicitly contingent upon the negotiation of a final contract".); *Essroc Cement Corp. v. CPRIN, Inc.,* No. 1:08-CV-974, 2009 WL 2033052, at *20 (W.D. Mich. Jul. 9, 2009) (dismissing fraudulent misrepresentation claim upon determining that it was unreasonable for plaintiff to claim it altered its behavior based on a conditional offer); *Laks v. Coast Fed. Sav. & Loan Ass'n,* 60 Cal. App. 3d 885, 893, 131 Cal. Rptr. 836, 841 (Cal. App. 1976) (Affirming dismissal of promissory estoppel claim because experienced businessmen were held to understand the conditional nature of the offer; and "they could not have had legitimate expectations that [the offer] was a binding offer; therefore, they could not reasonably have relied on it.")

[20] In support of this argument, the Trustee cites to *Aceves v. U.S. Bank, N.A.,* which distinguished the *Laks* case since the borrower in *Aceves* did not seek to enforce a promise, but stated claims for promissory estoppel and fraud when the borrower refrained from certain actions because she reasonably relied upon

because the Defendants represented that the conditions of the Stanhill Offer were mere formalities. The Trustee argues that courts have found justifiable reliance despite a writing that disclaims reliance or contradicts it.[21]

However, the Defendants further assert that Evergreen's conduct, as alleged in the Complaint, was *inconsistent* with a claim of reliance. The Complaint alleges that Evergreen submitted counterproposals to the Stanhill Offer and, therefore, Evergreen could not reasonably have considered the Stanhill Offer binding if it was still negotiating.[22] Moreover, the Defendants point to the following allegations which undermine the Trustee's argument that Evergreen refrained from soliciting alternative transactions in reliance on the Stanhill Offer:

- Evergreen formed the Special Committee to negotiate a potential transaction with Stanhill *and* solicit alternative transactions, if the Special Committee deemed it appropriate (Compl. ¶51);

- Evergreen's financial advisor initiated a "market test" to evaluate the Stanhill Offer (Compl. ¶66);

- The Evergreen board discussed contacting Stanhill to "see if the terms of the Stanhill Offer remained outstanding or had been revised" (Compl. ¶77);

---

the bank's offer to negotiate and modify the loan. *Aceves v. U.S. Bank., N.A.,* 192 Cal.App. 4th 218, 227-28 (Cal. App. 2011).

[21]   *Denver Health and Hospital Auth. v. Beverage Distrib. Co., LLC,* 843 F.Supp.2d 1171, 1179-80 (D. Colo. 2012) (Court determined that a written policy that conflicted with a claim of reliance did not prevent the hospital from asserting a negligent misrepresentation claim); *Mehaffy,* 892 P.2d at 238 (deciding that a bank's "comfort letter" disclaiming reliance did not prevent the bank from asserting a negligent misrepresentation claim).

[22] *Glass,* 133 F.3d at 1004 (deciding that submitting a counteroffer shows that the plaintiffs "did not believe themselves bound by any earlier exchanges concerning a new contract.").

- The Evergreen board concluded that the status of negotiations with Stanhill is uncertain (Compl. ¶¶ 82-83); and

- Evergreen's financial advisor stated that it had contacted 60 potential acquirers of K-Fuel and all but one of the 60 had not responded or declined to participate (Compl. ¶85).

I conclude that the Complaint's allegations do not support an inference that Evergreen justifiably relied upon the Stanhill Offer and refrained from seeking alternate transactions. The first and second counts will be dismissed.

2. Breach of Fiduciary Duty

In the Complaint, the Trustee alleges that Khan had conflicting interests and duties arising from his role as Chairman and Director of Evergreen, and his interests in White Energy, Stanhill, and other affiliated entities. The Trustee asserts that Khan breached the fiduciary duties of loyalty, due care, and candor that he owed to Evergreen. The Defendants claim that the breach of fiduciary duty claim is not supported by the allegations in the Complaint because (i) Khan was not acting as a fiduciary on the Stanhill Offer because he removed himself from the decision-making process; and (ii) Khan is protected by the exculpation clause in Evergreen's Restated Certificate of Incorporation With Amendments of K-Fuel, Inc. (the "Certificate of Incorporation"), which protects directors to the fullest extent permitted by the laws of Delaware, including Section 102(b)(7) of the Delaware General Corporation Law.

Delaware courts recognize the basic tenet that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation and, in discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its

shareholders.[23] "The duty of care has been described as the duty to act on an informed basis."[24] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[25] "To prove a breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred and that the transaction was unfair to the shareholders."[26]

Khan argues that he was not part of the Special Committee that was created to evaluate the Stanhill Offer. He relies on Delaware case law providing that a director who does not participate in the decision process of a challenged transaction cannot be held liable on a claim that the board wrongfully approved that transaction.[27] However, this rule does not apply here because the Complaint does not allege wrongful approval of a transaction, but instead alleges that Khan had divided loyalties in connection with his role in formulating and facilitating a bad faith offer which caused harm to Evergreen. "[D]irectors are required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess

---

[23] *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del. 1989) (citing 8 *Del.C.* § 141(a); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del. 1986); *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984) (overruled on other grounds); *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503, 510 (Del. Supr. 1939)). Delaware law applies to the claim for breach of fiduciary duty under the internal affairs doctrine, which provides that the state of incorporation has the authority to regulate a corporation's internal affairs. *In re Midway Games, Inc.,* 428 B.R. 303, 312-13 (Bankr. D.Del. 2010) (citing *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)).

[24] *In re USDigital, Inc.,* 443 B.R. 22, 41 (Bankr. D.Del. 2011) (citing *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993) *modified* 636 A.2d 956 (1994)).

[25] *USDigital,* 443 B.R. at 41 (quoting *Cede,* 634 A.2d at 361).

[26] *USDigital,* 443 B.R. at 41 (citing *Joyce v. Cuccia,* No. CIV.14953, 1997 WL 257448, *5 (Del. Ch. May 14, 1997)).

[27] *In re Tri-Star Pictures, Inc. Litigation,* Civ. A. No. 9477, 1995 WL 106520, *2 (Del. Ch. 1995) (citing cases).

a financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally."[28]

The exculpation clause in Evergreen's Certificate of Incorporation also does not support dismissal of the fiduciary duty claim. A section 102(b)(7) exculpation provision may "exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty."[29] "When a duty of care breach is not the *exclusive* claim, a court may not dismiss [the duty of care claim] based upon an exculpatory provision."[30] Here, the Trustee provides adequate factual allegations to support a plausible claim for a breach of the duty of care and the duty of loyalty. Accordingly, the Trustee's claim for breach of fiduciary duties will not be dismissed.

3.    Tortious Interference with Prospective Business Relations

The Trustee's fourth claim for relief alleges that the Stanhill Offer was not made in good faith and interfered with Evergreen's prospects to obtain financing to continue its operations. The Defendants argue that this claim must be dismissed because the Trustee fails to allege any prospective transactions that were reasonably likely to occur and, as a result of the alleged misconduct, failed to materialize.

The Tenth Circuit Court of Appeals, when analyzing Colorado law, wrote:

> To establish a claim for tortious interference with prospective business relations [under Colorado law], a plaintiff must show intentional and improper interference

---

[28] *Mills Acquisition,* 559 A.2d at 1280.

[29] *Stone v. Ritter,* 911 A.2d 362, (Del. 2006) (citing Del. Code Ann. Tit. 8, § 102(b)(7); *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del. 2006)).

[30] *Bridgeport Holdings, Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.),* 388 B.R. 548, 568 (Bankr. D.Del. 2008) (emphasis in original) (citing *Alidina v. Internet.com Corp.,* No. 17235, 202 WL 31584292, *8 (Del. Ch. Nov. 6, 2002)).

preventing the formation of a contract. The defendant can interfere either by inducing or causing a third party not to enter into or continue relations, or by preventing the plaintiff from acquiring or continuing the relations. It is not necessary to prove an underlying contract. However, a protected relationship exists only if there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope.[31]

The Trustee argues that he identifies two financing prospects in the Complaint. First, the Complaint alleges that the Stanhill Offer interrupted Evergreen's ATM sales, and that Khan knew that the Stanhill Offer would adversely affect those sales. Second, the Complaint alleges that the Committee's Financial Advisor informed Evergreen that it had contacted 60 potential acquirers of K-Fuel, and all, but one, either failed to respond or declined to participate due, in part, to Stanhill's competitive advantage.

The Trustee's Complaint fails to allege sufficient facts showing that the Stanhill Offer interfered with a relationship in which there was a reasonable likelihood that a contract would have resulted. The Trustee alleges potential ATM transactions without identifying investors, other than the public at large. This allegation is too vague and does not describe an existing relationship or anything more than the hope of a future economic relationship.[32]

The Trustee relies upon the case *Tara Woods, L.P. v. Fannie Mae,* in which the court determined that the plaintiff stated a claim for tortious interference with prospective business advantage when the plaintiff alleged that it had received purchase offers for the real property, although it had not entered into a contract with a prospective buyer.[33] Here, however, the

---

[31] *Klein v. Grynberg,* 44 F.3d 1497, 1506 (10th Cir. 1995) (citations omitted).

[32] *US West., Inc. v. Bus. Disc. Plan, Inc.,* 196 F.R.D. 576, 593-94 (D. Colo. 2000) (Plaintiff's allegations that defendant prevented business relationships with potential customers, without identifying any particular person or entity, represented nothing more than a "mere hope" of prospective contracts.)

[33] *Tara Woods, L.P. v. Fannie Mae,* 731 F.Supp.2d 1103, 1119 (D. Colo. 2010).

Trustee's allegation about "potential acquirers" contacted by the financial advisor does not allege that any third party made an offer or was otherwise taking steps toward entering into a transaction with Evergreen prior to the Stanhill Offer. The Trustee alleges that the Stanhill Offer chilled the market for K-Fuel without identifying any economic relationship with a prospective buyer that was hindered.[34] The Trustee's fourth claim for tortious interference with prospective business relations will be dismissed.

4.    Fraudulent Transfers

Claims five through twelve of the Complaint seek to avoid transfers made to SSSF and Crosby (Hong Kong) as constructive fraudulent transfers, alleging that Evergreen did not receive reasonably equivalent value in return for the payments (the "Fraudulent Transfer Claims").[35] The Defendants argue that the Fraudulent Transfer Claims must be dismissed because the Complaint alleges that the transfers were paid to satisfy debts incurred through arms-length negotiations in connection with the PSA and PSA2 and, therefore, fails to create a plausible inference that Evergreen did not receive reasonably equivalent value for the transfers.

The Trustee argues that the Complaint adequately alleges a lack of reasonably equivalent value because the transfers exceeded the agreed terms of the PSA and PSA2, and exceeded the market rate for comparable investment banking services. The Complaint also alleges that the

---

[34] *See Westside Center Assoc. v. Safeway Stores 23, Inc.,* 42 Cal.App. 4th 507, 523-28 (Cal. Ct. App. 1996) (The plaintiffs alleged that the defendants closed an anchor tenant store in a shopping center and kept the building vacant in an attempt to artificially lower the value of the shopping center. The court decided that plaintiff's theory that defendants "interfered with the market" was not sufficient to support a claim for intentional interference with prospective economic advantage.)

[35] The Fraudulent Transfer Claims are brought under Bankruptcy Code §548(a)(1)(B), and Bankruptcy Code §544 and Colorado Stat. 38-8-105(b)(I) and (II) and 38-8-106(1).

SSSF and Crosby (Hong Kong) failed to provide the placement services due under the agreements, which services were performed by others.

The Third Circuit employs a "totality of the circumstances" analysis to determine whether reasonably equivalent value has been given, "taking into account 'the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms-length.'"[36] "The analysis is inherently fact driven."[37]

The Complaint adequately alleges plausible claims for avoidance of payments as fraudulent transfers. The Motion to Dismiss will be denied as to claims five through twelve.

5.    Preferential Transfers

Claims thirteen and fourteen in the Complaint allege that payments to SSSF and Crosby (Hong Kong) should be avoided and recovered pursuant to Bankruptcy Code §§ 547(b) and 550 (the "Preference Claims"). To avoid payments made between ninety days and one year before a bankruptcy filing, the creditor receiving the payment must be an insider at the time of the transfer.[38] Pursuant to the Bankruptcy Code, an "insider" of Evergreen would include:

---

[36] *Charys Liquidating Trust v. McMahan Sec. Co., L.P. (In re Charys Holding Co., Inc.)*, 443 B.R. 628, 637 (Bankr. D.Del. 2010) (quoting *Peltz v. Hatten*, 279 B.R. 710, 736 (D.Del. 2002)). *See also Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157, 1163 (Colo. App. 2003) (When analyzing reasonably equivalent value in the context of the Colorado Uniform Fraudulent Transfer Act, the Court wrote that "[d]etermination of reasonably equivalent value requires analysis of all the facts and circumstances surrounding the transaction. The standard of 'reasonably equivalent value' implies a rule of reasonableness in light of the particular circumstances.") (quoting *Schempp v. Lucre Mgmt. Grp,. LLC*, 18 P.3d 762, 765 (Colo. App. 2000)).

[37] *Charys Holding*, 443 B.R. at 637. *See also Argus Mgmt. Grp. v. Chanin Capital Partners, LLC (In re CVEO Corp.)*, 320 B.R. 258, 264-65 (Bankr. D.Del. 2005) (deciding that reasonably equivalent value was not demonstrated as a matter of law solely because the transfer paid an antecedent debt; instead the court determined there was a genuine issue of material fact as to whether the debtor received reasonably equivalent value in return for services provided by a financial advisor to a committee).

[38] 11 U.S.C. §547(b)(4)(B).

(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor.[39]  Although

SSSF and Crosby (Hong Kong) do not fall within the Bankruptcy Code's definition of insider,

the Trustee argues that they are non-statutory insiders of Evergreen.  The Defendants oppose

this, arguing that SSSF and Crosby (Hong Kong) were paid pursuant to contracts (i.e., the PSA

and PSA2) that were negotiated at arms-length before Khan joined Evergreen's board.

     Because the Bankruptcy Code's definition of "insider" uses the term "including," courts

have recognized that "insiders" are not limited to creditors who fit within the enumerated

categories of § 101(31).[40]  "An insider is one who has a sufficiently close relationship with the

debtor that his conduct is made subject to closer scrutiny than those dealing at [arms'] length

with the debtor."[41]  Thus, non-statutory insiders need not have control over a debtor; rather,

courts will analyze (i) whether there is a close relationship between the debtor and creditor, and

(ii) whether there is some evidence, other than the relationship, suggesting that any transactions

were not conducted at arm's length.[42]

     The Complaint alleges that Khan owned or controlled SSSF and Crosby (Hong Kong).

The Complaint alleges that the PSA was negotiated at the same time that Khan was invited to

join Evergreen's board, but the Complaint also alleges that the PSA was amended to increase

---

[39] 11 U.S.C. §101(31)(B).

[40] *Shubert v. Lucent Tech., Inc. (In re Winstar Commc'n, Inc.),* 554 F.3d 382, 395 (3d Cir. 2009).

[41] *Winstar,* 554 F.3d at 397 (quoting S.Rep. No. 95-989, at 24 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5810).

[42] *Burtch v. Opus, LLC (In re Opus East, LLC),* 528 B.R. 30, 93 (Bankr. D.Del. 2015) (citing *Winstar,* 554 F.3d at 396-97.

compensation after Khan was a director of Evergreen and that Evergreen paid the transfers at issue to SSSF and Crosby (Hong Kong) when Khan was a director of Evergreen. Further, the Complaint alleges that the payments to SSSF and Crosby (Hong Kong) exceeded the terms of the PSA and PSA2 and were excessive based on the market rate for comparable services. These allegations of a close relationship and excessive payments are sufficient to warrant closer scrutiny of the claims.[43]    The motion to dismiss claims thirteen and fourteen will be denied.

6.    Violation of 15 U.S.C. §78o(a)(1)

The Trustee's final claim alleges that Crosby (Hong Kong) received fees for brokerage services in violation of 15 U.S.C. § 78o(a)(1) and, therefore, PSA2 is void and any amounts paid to Crosby (Hong Kong) thereunder should be returned.[44]    The Defendants argue that the claim should be dismissed because Crosby (Hong Kong) was associated with Lazard Capital Markets, LLC, which was the agent registered with the Securities and Exchange Commission that assumed responsibility under the regulations for the placement. The Trustee, in response, argues that the claim should stand and Crosby (Hong Kong) must prove that it meets the exemption claimed.

---

[43] *See In re Fortune Natural Resources Corp.*, 350 B.R. 693, 696 (Bankr. E.D. La. 2006) ("[I]t would be both folly and a triumph of form over substance to hold the LLC over which [an insider] exerts complete control is not an insider. Certainly Congress' reasons for requiring heightened scrutiny for certain individuals apply with equal force to entities entirely controlled by such individuals.")

[44] 15 U.S.C.A. §78o(a)(1) provides:
(a)    Registration of all persons utilizing exchange facilities to effect transactions; exemptions
    (1)    It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

The allegations in the Trustee's claim against Crosby (Hong Kong) for violation of

15 U.S.C. §78o(a)(1) are broad and conclusory. The Trustee does not identify any specific

transactions or fees received by Crosby (Hong Kong). Accordingly, this claim will be dismissed.

7.    Amendment of the Complaint

In a letter brief filed after oral argument, the Trustee requested leave to amend the

Complaint in the event that the Court granted dismissal of any claims. Rule 15 of the Federal

Rules of Civil Procedure provides that a court should freely give leave to amend a pleading when

justice so requires.[45] "The Supreme Court has held that leave should be 'freely given' by the

courts in the absence of any 'undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment, [or] futility of amendment . . .'"[46]

At issue here is whether allowing amendment of the Complaint would be futile.

"'Futility' means that the complaint, as amended, would fail to state a claim upon which relief

could be granted."[47] In assessing futility, "a trial court may properly deny leave to amend where

the amendment would not withstand a motion to dismiss."[48]

In the letter brief, the Trustee asserts virtually the same facts as already found in the

Complaint in support of the first and second claims for fraud and negligent misrepresentation,

---

[45] Fed.R.Civ.P. 15(a)(2), made applicable hereto by Fed.R.Bankr.P. 7015.

[46] *PCT v. Authentic Specialty Foods, Inc. (In re Fleming Co., Inc.),* 347 B.R. 163, 166 (Bankr. D.Del. 2006) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

[47] *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 622 (1st Cir. 1996)).

[48] *Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co., Inc.),* 443 B.R. 638, 643 (Bankr. D.Del. 2011) (citing cases).

although the Trustee asserts with more specificity inferences that should arise from those facts. These facts and inferences focus on whether the Stanhill Offer was a bona fide offer, but do not provide further factual support regarding Evergreen's alleged justifiable reliance on the Stanhill Offer. Therefore, I conclude that leave to amend the first and second claims should not be granted.[49]

The Trustee also seeks an opportunity to amend the fifteenth claim for relief (violation of 15 U.S.C. §78o(a)(1)) by adding allegations that Crosby (Hong Kong) filed a Form W-8ECI, which is a form filed by foreign persons to report income received from conducting a trade or business in the United States. This would provide more facts to support the Trustee's fifteenth claim. The Trustee will have an opportunity to amend the Complaint accordingly.


CONCLUSION

For the reasons set forth above, the Defendant's Motion to Dismiss will be granted, in part, and denied, in part, as follows:

1.      The request to dismiss the claims based on fraud and negligent misrepresentation (First and Second Claims for Relief) will be granted;

2.      The request to dismiss the claim for breach of fiduciary duty (Third Claim for Relief) will be denied;

3.      The request to dismiss the claim for tortious interference with prospective business relations (Fourth Claim for Relief) will be granted;

---

[49] The letter brief does not request leave to amend the fourth claim for tortious interference with prospective business relations, but the inferences arising from the alleged facts in the Complaint lead me to conclude that an attempt to amend that claim also would be futile.

4.      The request to dismiss the Fraudulent Transfer Claims (Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth Claims for Relief) will be denied;

5.      The request to dismiss the Preference Claims (Thirteenth and Fourteenth Claims for Relief) will be denied;

6.      The request to dismiss the claim for violation of 15 U.S.C. §78o(a)(1) (Fifteenth Claim for Relief) will be granted, but the Trustee is granted leave to amend this claim.

An appropriate order will follow.


BY THE COURT:



_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  February 11, 2016